PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7193
     FAX: (415) 436-6982
     nikhil.bhagat@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>TONY ARCHULETA-PERKINS,<br><br>     Defendant. | Case No. CR 24-0360-JSC<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>Sentencing Date:  May 21, 2025<br>Sentencing Time:  10:00 a.m.<br><br>Before: The Honorable Jacqueline Scott Corley |

1

## **TABLE OF CONTENTS**

2   I.      INTRODUCTION ........................................................................................................3

3   II.     PROCEDURAL HISTORY.......................................................................................3

4   III.    THE SENTENCING GUIDELINES .......................................................................3

5   IV.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE REFLECT
        EVOLVING AND INCREASINGLY SOPHISTICATED CRIMINAL CONDUCT............................4

6
        A.      Murietta Valley High School Class of 1994 ........................................4
7
        B.      The Stolen Tax Refunds Schemes ($53,910.69).................................4
8
        C.      The Payroll Scheme ($106,300) ...........................................................6
9
        D.      The Bill Payment/Expert Witness Scheme ($1,161,542.03) ...........6
10
        E.      The Defendant's Use of Stolen Money to Maintain Three Homes, Premium
11              Class Travel, Ultraluxury Goods, and a Generally Lavish Lifestyle. ...................7

12      F.      Discovery of the Fraud, the Defendant's Partial Confession, and Emptying
13              Out the MVHS Bank Account ........................................................8

    V.      THE DEFENDANT'S HISTORY AND CHARACTERISTICS...............................9
14
    VI.     GENERAL DETERRENCE IS PARTICULARLY IMPORTANT IN SENTENCING
15      FOR WHITE COLLAR CRIMES LIKE THIS ONE ..................................................11

16  VII.    UNDER THE FIRST STEP ACT, THE TIME THE DEFENDANT ACTUALLY
        SERVES WILL LIKELY BE SUBSTANTIALLY LESS THAN THE COURT IMPOSES.................12
17
        A.      Good Conduct Time.................................................................12
18
        B.      Earned Time Credit .................................................................12
19
    VIII.   RESTITUTION AND FORFEITURE.................................................13
20
    IX.     CONCLUSION.......................................................................14
21

22

23

24

25

26

27

28

## I.    INTRODUCTION

The defendant, who is highly educated and earned approximately $300,000 per year, engaged in a years-long embezzlement, first stealing from a co-worker at a food company, and then taking advantage of the COVID-19 pandemic and his employer's dire health situation to begin stealing from the small law firm where he worked. He laundered those stolen funds through a non-profit organization that he solely controlled. What's more, he used the stolen funds not to meet basic living expenses or to assist vulnerable family members, but to attain and maintain a lavish lifestyle that included the maintenance and renovation of two San Francisco houses and a Palm Springs vacation home, ultraluxury fashion and premium class international travel.

In light of the seriousness of the defendant's criminal conduct, the need for specific and general deterrence, and the need for just punishment, the Court should impose a sentence of 37 months in the custody of the Bureau of Prisons, followed by a term of three years supervised release, both to run concurrently, restitution of $1,321,752.72 minus the amount the defendant had already paid the victims, and a $100 special assessment as to each count.

## II.    PROCEDURAL HISTORY

On June 27, 2024, the grand jury returned an Indictment charging Mr. Archuleta-Perkins with eight counts of Bank Fraud in violation of 18 U.S.C. § 1344(2) and five counts of money laundering in violation of 18 U.S.C. § 1957.  PSR ¶ 1. The next day, he was arrested, brought before a magistrate judge, and released on an agreed bond. On October 17, 2024, the parties entered into a stipulation providing for certain funds from a house sale to be deposited into the Clerk's registry in anticipation of an eventual restitution award in this case. *See* ECF Nos. 26, 27.  In November 2024, the Clerk received approximately $256,000.  *See* ECF Nos. 30, 31. On December 11, 2024, pursuant to a plea agreement, the defendant pleaded guilty to one count of Bank Fraud and one count of Money Laundering. PSR ¶ 2.

## III.    THE SENTENCING GUIDELINES

The parties agreed on particular sentencing guidelines in the plea agreement, which contemplated an adjusted offense level of 21. *Id.* ¶ 3. The probation officer calculated an adjusted offense level of 23. *Id.* The probation officer observed, correctly, that the parties did not consider that a

1  person who receives a vulnerable victim enhancement under U.S.S.G. § 3A1.1(b), as Mr. Archuleta-

2  Perkins did, is not eligible for a zero-point offender reduction under U.S.S.G. § 4C1.1.  The government

3  is nonetheless contractually bound by its calculations in the plea agreement and intends to meet those

4  obligations by recommending "a sentence no higher than the low end of the range associated with the

5  Guidelines calculation set out in paragraph 7 [of the Agreement]" Plea Agreement ¶ 15.

6  **IV.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE REFLECT EVOLVING AND INCREASINGLY SOPHISTICATED CRIMINAL CONDUCT**

7  **A.    Murietta Valley High School Class of 1994**

8  The defendant is a 1994 graduate of Murietta Valley High School. PSR ¶ 81.  In 2013, he formed

9  a non-profit organization called "Murietta Valley High School Class of 1994," (MVHS 1994) apparently

10  as a vehicle to raise money for his 20th high school reunion.  *See* PSR ¶ 13, 32 ("I have some wonderful

11  news . . . . [MVHS 1994] is a 501(c)(3) nonprofit organization").  The defendant promptly opened a

12  Chase Bank account for MVHS 1994, which he would utilize for his various schemes. *Id.* ¶ 16. From

13  2018 on, the MVHS 1994 account was used practically exclusively to launder stolen money from Mr.

14  Archuleta-Perkins's employer. *See id.* ¶ 19.

15  **B.    The Stolen Tax Refunds Schemes ($53,910.69)**

16  From 2013 to 2017**,** the defendant worked at Noble Foods Co. (also known as the Happy Egg

17  Company), which at the time was a U.S.-based subsidiary of a United Kingdom-based food distribution

18  company. *See* PSR ¶¶ 6, 86.  He was the Director of Accounting and earned $95,000 a year.  *Id.* ¶ 86.

19  At Noble Foods, part of the defendant's job was to pay bills for the company; he had access to its

20  accounts  and its mail.  *Id. ¶* 6. The defendant worked with a number of British citizens, one of whom

21  was S.A. *Id.*  S.A., with whom Archuleta-Perkins was close, left the U.S. subsidiary in approximately

22  August 2016[1] and returned to the U.K.

23  But because taxes were withheld from her paycheck for the time she worked in the U.S. in 2016,

24  the IRS issued her a federal tax refund in the amount of $10,258 and the Franchise Tax Board issued her

25  a state income tax refund in the amount of $1,989. Those checks were mailed to her at the San Francisco

26  address of Noble Foods, where the defendant worked. At some point between late April 2017, when the

27

28

_____

[1] The PSR erroneously notes this date as "December 2016."

1  checks were issued, and the time when Archuleta-Perkins left the company in July, he took them from

2  the mailroom. *See id.*

3      On July 6, 2017, the defendant endorsed both checks—totaling just over $12,000—and deposited

4  them into a Chase bank account in the name of MVHS 1994. *Id.* A few days after the funds cleared into

5  the MVHS 1994 account, Archuleta-Perkins wrote a $10,000 check to himself and deposited it into his

6  personal account; he used this money on personal expenses.

7      Later that month, he was hired by Law Firm A, a small personal-injury firm in San Francisco, to

8  handle its finances. *Id.* ¶ 85.

9      When he had been working at Law Firm A for about a year, he saw that the Firm, too, had

10 received a tax refund check. This one was much larger. Taking advantage of the fact that he ran the

11 Firm's finances, he again took this check and deposited it into the MVHS 1994 account. Within days,

12 he then wrote himself a check for that entire amount—$41,663.69—and deposited it into his personal

13 account:

 

23 *See id.* ¶ 17. There is another reason the defendant chose this particular moment to strike. The principal

24 of Law Firm A (W.V.), who is in his 80s, was seriously ill. The defendant knew that in the Summer of

25 2018, W.V. was undergoing serious health concerns, including out-of-state transplants and surgeries. *Id.*

26 at 18. He wasn't in the office very much and Archuleta-Perkins took advantage of that to begin stealing

27 from the Firm.

28

GOVERNMENT'S SENTENCING MEMORANDUM
CR 24-360 JSC                              5

### C.    The Payroll Scheme ($106,300)

Although tax refund checks were an easy way to steal from his employer, they were few and far between. The defendant had to find other ways to continue his grift, he did. As the CFO of the Law Firms, Archuleta-Perkins was also responsible for payroll. He could have simply increased his salary or bonus beyond the authorized amount, but because a salary or bonus was income to him, the Firm's payroll software would have automatically deducted income taxes from that amount, thus reducing the net amount that the defendant could steal.  Instead, using the Firm's payroll software, he paid himself false and fraudulent *reimbursements*—which, as a financial professional, he knew were not subject to tax withholdings and thus allowing him to keep more of his ill-gotten gains. The defendant's $6,500 fake reimbursement on February 27, 2018 appears to be the first instance of him stealing from the Firms. *See* Plea Agreement at 4.  In total, from 2018 through about 2023, Archuleta-Perkins stole at least $106,300 this way. *Id.*

### D.    The Bill Payment/Expert Witness Scheme ($1,161,542.03)

But the overwhelming majority of the defendant's embezzlement happened through the Firms' bill payment process. Like lots of personal injury law firms, the victim firms here regularly hired expert witnesses—to assist in proving damages and causation before and during trial, and for many other reasons.  The firms paid a lot of money to experts.  The defendant knew this and figured out that it was an easy way to obscure his theft.

Five months after he first took money through the payroll system and three months after he took the tax refund check, Archuleta-Perkins again began taking advantage of his access as the erstwhile CFO of the Firm.  He began to engineer a number of bill payments to "MVHS 1994"—his solely-controlled nonprofit. *See id.* ¶ 20. In some cases, he would issue his own checks using the Firm's accounting software, and in other cases, he would process the checks and/or direct deposits through the Firms' third-party vendor, Bill.com.  In order to avoid detection, he labeled them as "expert witness" payments

and varied the amounts.  Below is an example of one of the checks that Archuleta-Perkins obtained

through Bill.com:



In at least some cases, the defendant further "papered" the thefts by creating fake invoices he

made using a service on the Internet and uploading them to the Bill.com system:



From August 2018 through December 2023—a period spanning more than five years—

Archuleta-Perkins stole at least $1,161,542.03 through the Bill Payment schemes.  In total, across the

schemes, the defendant stole $12,247 from S.A. and $1,309,505.72 from the law firms.

**E.    The Defendant's Use of Stolen Money to Maintain Three Homes, Premium Class Travel, Ultraluxury Goods, and a Generally Lavish Lifestyle.**

The defendant did not use the money for daily necessities. He did not use the money for drugs.

He did not use the money for philanthropy.  He used it for "the lifestyle." *Id.* ¶ 43(v).  Home renovations

and mortgage payments on his three homes. *Id.* ¶ 30 & n.1.  International business class travel that he

posted on his Instagram account.  Ultraluxury goods like the ones he posted on his social media account:

1
2
3
4
5
6
7
8
9
10



11
12

**F.      Discovery of the Fraud, the Defendant's Partial Confession, and Emptying Out the MVHS Bank Account**

13  In late 2023, W.V.'s wife, who handled billing for Law Firm A, started going through the Firm's

14  finances and discovered significant unexplained payments to MVHS 1994.  Open-source research

15  revealed that MVHS 1994 was controlled by Archuleta-Perkins.

16  On December 13, 2023, after the Firm's partners had discovered the fraud, they confronted

17  Archuleta-Perkins with what they had uncovered.  Faced with unimpeachable evidence, the defendant

18  took partial responsibility.  The victims—who were, after all, lawyers—drafted a written confession and

19  the defendant signed it.  He was then fired. *See* PSR ¶ 11.

20  But like many cheaters who find themselves confronted with the truth, the defendant's admission

21  substantially minimized his criminal conduct.  He admitted to what he thought his employer already

22  knew. He only acknowledged the Bill.com part of his scheme, not the tax refund theft or the six-figure

23  payroll check theft.  And he eventually admitted to stealing "for at least two years," but did not mention

24  that he had in fact been taking money from the firms for more than five—nearly the entire length of his

25  employment there.  *See* PSR ¶ 10.

26  But most tellingly, within a few hours of being fired, Archuleta-Perkins went to a Chase Bank

27  branch and withdrew nearly the entire remaining balance in the MVHS 1994 bank account in cash—thus

28  ensuring that his victims would not be able to access it. *See* PSR ¶ 11.

**V.     THE DEFENDANT'S HISTORY AND CHARACTERISTICS**

The defendant is 49 years old. He is highly educated and holds both a Master of Business Administration and a Master of Science in Real Estate.  PSR ¶ 81. Although he endured trauma as a young child, PSR ¶ 67–68, that trauma cannot explain his lengthy and sustained criminal conduct as a man in his 40s. Mr. Archuleta-Perkins has never been addicted to drugs or alcohol, nor does the PSR reflect a gambling addiction, as is sometimes the case in financial crimes. PSR ¶ 80.  Archuleta-Perkins is not a lawyer, but during the time he was working for and stealing from the law firms, he was paid an average of more than $282,000—a salary exceeding that of a United States Circuit Judge. *See* PSR ¶ 85.

His spouse, meanwhile, earned approximately $330,000 a year,[2] reflecting a total household income of more than half a million dollars.  In other words, he did not need the money. And as is common for many white-collar criminals, aside from a DUI arrest, he does not have a criminal history, but its inaccurate to label him a "first-time offender."  Def. Sent. Mem. at 10. He began the conduct at issue as far back as 2017, and it continued consistently—month after month, year after year—until he was finally caught in December 2023. This was not a single aberration of an otherwise law-abiding citizen; it was a routine way of life. Every time the defendant made a fake payroll entry, every time he entered in a fake expert witness expense, every time he endorsed a check and every time he moved money from MVHS to his own account was another opportunity for him to reflect on his conduct and stop doing it—to stop stealing. Over five years, that amounts to hundreds of opportunities. A well-educated, highly paid professional, he never took advantage of any of them. There is no indication that he would have *ever* stopped, if someone had not stopped him.

And even after he was confronted with an investigation, the defendant gave, at best, a partial confession, not admitting to anything the Firm didn't already know about, and emptying out the MVHS bank account nearly immediately thereafter.

It is true that after he lost his well-paying job that he had exploited to steal more than a million dollars, the defendant had trouble keeping up with the mortgages on his *three* houses, which he used

---

[2] When the defendant and his spouse purchased a new Jeep in 2024, *see* PSR ¶ 39, his spouse self-reported an income of $330,000 annually. The PSR later reflects a lower self-reported amount but this is presumably after payroll deductions for taxes, retirement, insurance, and other expenses and reflects net take home pay.

victim money to fund.  And it is also true that he cooperated with the government and the victims in the sale of those houses.  And that benefited the victims, who will presumably see their restitution faster.  But these choices were not wholly altruistic; they benefited Mr. Archuleta-Perkins, too.

On December 13, 2023, the day he was confronted by his employer, Mr. Archuleta-Perkins knew that his victims, personal injury lawyers, would likely enforce their legal rights.  By the time his lawyer contacted the victims, *see* Def. Ex. B at 14 (Dec. 21, 2023), the victims had already sued him and his spouse in San Francisco Superior Court.  *See* Case No. CGC-23-611205 (Cal. Super. Ct. filed Dec. 20, 2023).

In January 2024, when the Summit Way property was sold for $1.45 million, *see* Def. Sent. Mem. Ex. C, the victims had a *lis pendens* on it in connection with their suit.  Archuleta-Perkins could not have sold it without the cooperation of the victims.  What's more, as an experienced real estate agent and legal and financial professional, he knew that selling a home before it went into foreclosure would likely yield a better price and thus, a greater credit against the money he knew he would eventually be ordered to pay the victims.  The same is true of the 14th Avenue house; by the time of that sale, both the government and the victims had *lis pendens* on the property, and everyone's cooperation was required to ensure that Mr. Archuleta-Perkins's restitution obligations would be credited in the greatest amount possible.

## I.    THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES MILITATES IN FAVOR OF A 37-MONTH SENTENCE

A 37-month sentence would be consistent with that imposed for similar conduct by other courts. The JSIN data reflects an average sentence of 35 months and a median sentence of 36 months for similar conduct. *Id.* ¶ 113. But this case is especially egregious, considering the length of time the defendant engaged in the conduct, the sophistication and multimodal nature of the theft, and his background as a highly-educated professional.

In the most recent law firm embezzlement case in this district, Judge Alsup sentenced Jairo Santos to 36 months in prison.  *See* Amended Judgment, ECF No. 37, *United States v. Santos*, No. CR 23-230 (Apr. 11, 2024). Compared to Mr. Archuleta-Perkins, Santos's embezzlement was much less sophisticated: rather than orchestrate a scheme where he laundered his money through a non-profit he

controlled and labeling the embezzled funds as expert witness payments, Santos just wrote checks to himself and forged the managing partner's signature. *See* Gov't Sent. Mem. at 2, ECF No. 30, Case No. 3:23-CR-230 (Mar. 5, 2024). And unlike Mr. Archuleta-Perkins, Mr. Santos had some explanation for his crimes: alcoholism and a gambling addiction. *See* Transcript of Sentencing at 16–17, ECF No. 39, Case No. 3:23-CR-230 (Mar. 12, 2024). Although Santos stole for longer, he took less. *See id.* at 3, 22. In imposing sentence, Judge Alsup characterized Mr. Santos's crime to be "an egregious case" of someone who stole from lawyers who "struggled to make a business work and . . . trusted him to help do [their] job for a long time," simply "unforgivable." *Id.* at 22. Those words ring true here, too.

Imposing a 37-month sentence would meet the statutory sentencing requirement to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## VI.    GENERAL DETERRENCE IS PARTICULARLY IMPORTANT IN SENTENCING FOR WHITE COLLAR CRIMES LIKE THIS ONE

As evidenced by the fact that the defendant's crimes continued undetected for so long, embezzlement is, by its very nature, difficult to detect. Sophisticated individuals like Mr. Archuleta-Perkins take advantage of the trust placed in them by others for their own financial gain. "White collar criminals may be particularly susceptible to general deterrence because defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (cleaned up).

Tony Archuleta-Perkins stole for so many years because he thought he could get away with it; imposing a serious custodial sentence would "promote respect for the law" and "afford adequate deterrence to criminal conduct." 18 U.S.C.§§ 3553(a)(2)(A),(B). *Accord United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the §3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense"). In other words, in considering a sentence, it is particularly important with respect to this kind of case that the sentence imposed make future embezzlers think twice. A 37-month sentence would accomplish that goal.

## VII. UNDER THE FIRST STEP ACT, THE TIME THE DEFENDANT ACTUALLY SERVES WILL LIKELY BE SUBSTANTIALLY LESS THAN THE COURT IMPOSES

The First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) (the "FSA"), was enacted on December 21, 2018. As relevant here, a prisoner can earn time credit under the FSA in two ways: Good Conduct Time and Earned Time Credit.

### A. Good Conduct Time

A well-behaved prisoner can earn "up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b). Congress intended this provision to provide an incentive for good behavior and to deter misconduct. *See Barber v. Thomas*, 560 U.S. 474, 482-83 (2010); *see also United States v. Martin*, 100 F.3d 46, 48 (7th Cir. 1996) (quoting legislative history stating, "If a prisoner is aware that his behavior will have a direct effect on his release date, he can set a personal goal for early release by demonstrating compliance with prison rules. Thus, prison discipline should improve greatly.") (citations omitted)). All inmates convicted of a federal offense are eligible to earn Good Conduct Time.

Before the FSA, there had effectively been a cap of approximately 47 days earned annually on such Good Conduct Time. Section 102(b) of the FSA amended 18 U.S.C. § 3624, making this provision more generous by allowing additional credit for good conduct and providing that the credit be based on the sentence imposed rather than actual time served. *See id.*, 18 U.S.C. § 3624(b)(1). This means that the BOP will calculate Good Conduct Time based on a prisoner's whole sentence, not just the time a prisoner actually serves. For example, a 10-year sentence now yields a maximum Good Conduct Time of 540 days (54 x 10), rather than the maximum of 470 days it would have yielded prior to the FSA. As such, prisoners who exhibit "exemplary compliance with institutional disciplinary regulations" may now receive a maximum of "54 days for each year of the prisoner's sentence imposed by the court," including credit for time they never actually serve. *Id.*

### B. Earned Time Credit

The FSA also established a second system under which a prisoner can earn credit, Earned Time Credit, by participating in programs aimed at reducing recidivism. Each prisoner, who is to be evaluated

by the BOP for suitable "evidence-based recidivism reduction programming or productive activities," will be classified as presenting a minimum, low, medium, or high risk of recidivism. 18 U.S.C. § 3632(a)(3)-(6). Eligible defendants can accrue up to 15 days of Earned Time Credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. See id. § 3632(d)(4)(A)(i)-(ii). Twelve months (365 days) of those Earned Time Credits may be used to reduce a defendant's sentence. *See* 18 U.S.C. § 3624(g)(3). An inmate is eligible to earn Earned Time Credits if: (a) he was convicted of a United States federal code offense; (b) he was not convicted of a disqualifying offense;8 and (c) he is at an institution, but not in disciplinary segregation. Moreover, eligible prisoners are automatically enrolled in the program, and temporary operational or programmatic interruptions authorized by the BOP will not ordinarily affect an eligible inmate's "successful participation[.]" 28 C.F.R. § 523.41(c)(3). For example, to the extent a prisoner is unable to participate in evidence-based recidivism-reducing programs or activities as a result of the lack of availability at a BOP facility, the prisoner will still earn the time credit.

Given the defendant's offenses of conviction—bank fraud and money laundering—the BOP will likely deem him eligible for both good time and earned time credit; the Court may take that into account to the extent it bears on its analysis of the 3553 factors. *See United States v. Fowler*, 948 F.3d 663, 669–70 (4th Cir. 2020) (no plain error where district court considered good-time credits in context of sentencing factors); *Sash v. Zenk*, 439 F.3d 61, 67–68 (2d Cir. 2006) (observing that "defendants and judges routinely consider good time calculations in their decisions about plea bargains and sentencing").

## VIII.   RESTITUTION AND FORFEITURE

The defendant has agreed in his plea agreement to the amount of restitution he owes. *See* Plea Agreement ¶ 9, ECF No. 9. The Court should include an order of restitution to that effect as part of the judgment. Moreover, pursuant to the plea agreement, the Court has already entered a preliminary order of forfeiture in the amount of $1,321,752.72. ECF No. 38. As set forth in the probation officer's recommendation, *see* PSR Rec. at 6, and pursuant to Fed. R. Crim. P. 32.2(b)(4), the Court should include this in the judgment.

The defendant requests a "separate hearing on restitution and forfeiture," Def. Mot. at 10-11, but no such hearing is necessary. What is commonly-termed a "restitution hearing" is for the Court to make

a "final determination of the victim's losses." 18 U.S.C. § 3664(d)(5).  But the total amount of the victim's losses—and thus the restitution to be imposed in the judgment—is undisputed.  The defendant's concerns (and that of his spouse) go to how much money from available assets should be *credited* towards the defendant's restitution obligations. To the extent that a dispute to that end remains after sentencing, the parties may approach the Court for assistance, but it would not involve a "restitution hearing" in the traditional sense. And any decision the Court would make would not affect the judgment it entered in the case.

## IX.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 37 months in custody, followed by three years of supervised release as to each count, to run concurrently, a $200 special assessment, and restitution and forfeiture in the amount of $1,321,752.72.

Dated:  May 14, 2025                                    Respectfully submitted,

                                                        PATRICK D. ROBBINS
                                                        Acting United States Attorney


                                                        By: _____/s/_____
                                                            NIKHIL BHAGAT
                                                            Assistant United States Attorney